IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

IN RE:

BK 04-71731-CMS-13

ISAAC L. NOLAND
VANESSA AVERETTE NOLAND

    DEBTORS.

AP 07-70055-CMS

ISAAC L. NOLAND
VANESSA AVERETTE NOLAND

    PLAINTIFF

VS

WELLS FARGO BANK

    DEFENDANT

## MEMORANDUM OF DECISION

This adversary proceeding came before the court on October 28, 2009 for trial on the Complaint for Injunctive Relief, Declaratory Judgment, and, if necessary, to Re-Impose the Automatic Stay filed by Issac L. Noland ("Mr. Noland") and Vanessa A. Noland ("Mrs. Noland") (collectively "the Debtors"). Marshall A. Entelisano appeared on behalf of the Debtors; N. John Rudd, Jr. appeared on behalf of Wells Fargo Bank ("Defendant"). After consideration of the evidence submitted at trial, this court **GRANTS** the Debtors' request for a Declaratory Judgment and **FINDS** that the automatic stay is now and always has been in effect, that Defendant violated the automatic stay by initializing foreclosure proceedings against the Debtors' home, and that Defendant

1

shall pay $7,0000 plus attorney fees as damages to the Debtors.

## JURISDICTION

The Bankruptcy Court has jurisdiction of Debtor's Chapter 13 case pursuant to 28 U.S.C. § 1334(a). This court has jurisdiction of this issue, a core bankruptcy proceeding, pursuant to 28 U.S.C. § 1334(b). Jurisdiction is referred to the bankruptcy courts by the General Order of Reference of the United States District Courts for the Northern District of Alabama, Signed July 16, 1984, As Amended July 17, 1984.

## FINDING OF FACTS

This adversary proceeding was filed by the Debtors in an attempt to save their residence, located at 2518 Deer Antler Drive, Northport, AL 35473 ("Residence"), from foreclosure. The Debtors bought the Residence for $53,925.00 in 2001. (Plaintiff's Exhibit B, AP Doc. 5). Schedule A shows the value of the Residence at $65,000.00; Mr. Noland testified that the value of the Residence is $72,000.00. The Debtors currently reside in the Residence with their 4 children; all 4 children are currently enrolled in school. The following is a time-line of the events in the Debtors' bankruptcy that led to the Debtors filing this adversary proceeding:

**June 10, 2004** - Debtors commenced their bankruptcy case by filing a voluntary Chapter 13 bankruptcy petition. (Bk. Doc. 1). In Debtors' Schedule D, Option One Mortgage Corporation ("Option One") is listed as the holder of the Debtors' mortgage. Schedule D shows that Debtors owed Option One $54,214.00 in principal and $7,137.48 in arrears at the time the petition was filed. The Debtors' residence, which acts as collateral for Option One's mortgage, is valued at $65,000.00.

**June 15, 2004** - Debtors filed their Chapter 13 Plan Summary. (Bk. Doc. 5). The Chapter 13 Plan Summary listed Option One as a long-term debt and proposed to pay $595 per month on the total debt of $54,214.00 and proposed to pay $130.00 per month on the prepetition arrears of $7,137.48.

The plan further provided that the Debtor would pay the $595 payment directly to Option One beginning in July of 2004 and that the Chapter 13 Trustee would pay the $130 payment on the prepetition arrears to Option One through the plan.

**July 15, 2004** - Option One filed claim #2 asserting that the Debtors owed a "total debt" of $60,405.77 and prepetition arrears of $7,671.02.[1]

**August 24, 2004** - The Confirmation Order that confirmed Debtors' plan was entered. (Bk Doc. 19). The Confirmation Order provides for the same treatment of Option One as the Chapter 13 Plan Summary detailed above.

**November 19, 2004** - A Motion for Relief from the Automatic Stay was filed by Defendant as trustee for Option One. (Bk Doc. 22). Said motion alleged Debtors were in default on postconfirmation mortgage payments from September 1, 2004 through November 1, 2004, in the amount of $579.92 per month plus late charges and attorney fees for a total postpetition arrearage of $2,069.03.

**December 6, 2004** - Defendant filed an affidavit in support of its Motion for Relief setting out the same factual allegations as set out above. (Bk Doc. 26).

**December 15, 2004** - An Order was entered denying the Motion for Relief on the condition that the Debtors make payments curing the arrearage for the months of October and November of 2004 and make the current December mortgage payment. (Bk Doc. 27).

**August 9, 2006** - A second Motion for Relief From Stay was filed by Defendant. (Bk Doc. 37). Said motion alleged Debtors were in default on postconfirmation mortgage payments from June 1, 2006 through August 1, 2006, in the amount of $579.92 per month plus late charges and attorney fees.

**August 15, 2006** - Defendant filed an affidavit in support of its second Motion for Relief setting out the same factual obligations as set out above. (Bk Doc. 41).

**September 1, 2006** - An Order was entered denying the second Motion for Relief. The Order provided that the arrearage, fees and costs would be placed in the plan with the Debtors to resume making current payments with the September 1, 2006 payment. The Order further provided that in the event the Debtors failed to make any mortgage payment within the next eighteen months the stay would lift automatically if the default was not cured within 20 days of written notice of default provided by Defendant to Debtors and Debtors' attorney. (Bk Doc. 42).

---

[1] This prepetition arrears figure is slightly higher than the $7,137.48 figure shown in Debtors' Schedule D and in Debtors' Chapter 13 Plan Summary.

3

**August 10, 2007** - A letter was sent from Defendant to the Debtors and the Debtors' attorney stating that the debtors were in default on postconfirmation mortgage payments from April 1, 2007 through August 1, 2007. The letter constituted written notice of default as required by the Order conditionally denying the second Motion for Relief, and the Debtors had 20 days from the date of the letter to cure the default. (AP Doc. 5, Exhibit E).

**August 24, 2007** - Debtors' attorney faxed copies of Western Union Quick Collect receipts showing payments for the months of February 2007 through August 2007 to Well Fargos' attorney's office. (AP Doc. 6, Exhibit F).

**September 21, 2007** - Defendant filed a Notice of Continuing Default in which it asserted that the automatic stay had lifted because Debtors had been in default under the Order conditionally denying the second Motion for Relief for more than 20 days. (Bk Doc. 57).

**November 1, 2007** - The Debtors filed this adversary proceeding seeking: (1) a temporary restraining order to enjoin the foreclosure sale set for November 8, 2007; (2) a declaratory judgment as to the status of the automatic stay between the Debtors, the Defendant, and the Collateral; and (3) damages for Defendant's violation of the automatic stay.

**November 13, 2007** - An Order was entered enjoining foreclosure until further Order of the Court. (AP Doc. 11).

**January 22, 2008** - The parties announced that the matter was settled. (AP Doc. 16).

**October 2, 2008** - No order having been submitted, the court set the matter for hearing on November 4, 2008. (AP Doc. 18).

**October 30, 2008** - Defendant filed a Motion to Enforce Settlement Agreement (AP Doc. 20).

**December 23, 2008** - The court announced that the Motion to Enforce Settlement Agreement was denied and that the matter would be set for trial.

**October 26, 2009** - Debtors and Defendant filed Joint Stipulation of Facts wherein Defendant admitted that Debtors were current in mortgage payments when Defendant filed its Notice of Continuing Default and initiated foreclosure proceedings on September 21, 2007.

**October, 28, 2009** - Trial was held on this adversary proceeding. Admitted, by agreement, were Debtors' Exhibits A-G, AP Docs. 4, 5, and 6. At trial, the Debtors were the only witnesses called to testify. Debtors testified that they made their mortgage payments by Western Union Quick Collect, which effectively results in instantaneous payments upon submission by the sender. (Plaintiff's Exhibit F). Mrs. Noland further testified that she would call Option One and confirm the receipt of any payments that she made. After receiving the August 10, 2008 letter from Defendant, which asserted that the Debtors were in default, Debtors' attorney faxed Defendant's attorney a copy

4

of all relevant Western Union Quick Collect receipts. Despite the receipt of this fax, Defendant continued to assert that the Debtors were in default and initiated foreclosure proceedings.[2] Shortly thereafter, notice of foreclosure proceedings began running in the newspaper and Option One began to refuse to accept future payments on the mortgage account.[3] After the foreclosure proceeding was initiated, Debtors filed this adversary proceeding requesting an injunction to stop the foreclosure proceedings. A Temporary Restraining Order ("TRO") enjoining the foreclosure was issued by this court. The Defendant halted all proceedings upon such issuance.[4] As a result of the threatened foreclosure proceeding, the Debtors suffered embarrassment, humiliation, helplessness, and a pronounced fear of losing their home. Although neither of the Debtors sought medical or psychological help as a result of these unpleasant feelings, the Debtors both testified that they missed work and suffered sleepless nights.[5] Mr. Noland testified that his mother passed away during this period of time which exacerbated his feelings of helplessness. Mrs. Noland testified that she was very embarrassed when people would come by the Residence and take pictures and ask the neighbors if the Nolands still lived at the Residence. Mrs. Noland further testified that she was most upset by the reaction of her four children. The children were upset because they might have to move and change schools; this, in turn, upset Mrs. Noland and made her feel awful. Mrs. Noland also expressed that she agonized over what they would do if they really lost the Residence: their credit was shot and they had four children; she did not know if they could find a place to rent or how they would be able to afford a place to rent.

## CONCLUSIONS OF LAW

The filing of a bankruptcy petition acts as a stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" until such time as the court lifts the automatic stay or the property is no longer property of the estate. 11 U.S.C. § 362(a)(3); Bishop v. U.S. Bank/Firstar Bank (In re Bishop), 296 B.R. 890, 894 (Bankr. S.D.

---

[2] Neither of the Debtors could understand why Defendant continued to assert that the Debtors were in default after receipt of the fax.

[3] Debtors and Option One have now reworked the loan with current payments to resume November 2009.

[4] The Debtors testified that a second foreclosure publication was filed, but there was no evidence of this admitted at trial. In addition, the Debtors acknowledged that the second foreclosure was halted.

[5] Although both Debtors testified that they missed work, there was no evidence regarding the number of days the Debtors missed or the salary that the Debtors received per day of work.

5

Ga. 2003). The court entered an Order conditionally denying the lifting of the automatic stay which provided that in the event the Debtors failed to make any mortgage payment within the next eighteen months the stay would lift automatically if the default was not cured within 20 days of a written notice of default. (Bk Doc. 42). Defendant sent a written notice of default to the Debtors on August 10, 2007 alleging that the Debtors were five months in default. Per the court's order, Defendant gave the Debtors 20 days to cure the default. Fourteen days from the date of the written notice of default, the Debtors' attorney faxed to Defendant's attorney's office copies of proof that payment had been made for every month alleged to be in default in the amount of $580.00 each month. Defendant ignored these receipts, filed a Notice of Continuing Default with this court, and initiated foreclosure proceedings against the Debtors' Residence. A foreclosure proceeding against property of the estate constitutes an action to exercise control over property of the estate in violation of § 362(a)(3). Defendant now admits that the Debtors were not in default and that the Debtors had not missed any payments subsequent to the court entering the second Order which conditionally denied Defendant's Motion for Relief. Because the Debtors were never in default pursuant to terms of the second Order, the automatic stay was never lifted, and the initialization of foreclosure proceedings against the Debtors' Residence violated the automatic stay. Because the Defendant has admitted that it violated the automatic stay, the only issue for the court to decide is the amount of damages to be awarded to the Debtors as a result of such violation.

Section 362(k)(1) provides, in pertinent part: "[A]n individual injured by any willful violation of a stay provided by this section **shall** recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1) (emphasis added). "A willful violation does not require a specific intent to violate the automatic stay. The

6

standard for a willful violation of the automatic stay under § 362[k] is met if there is knowledge of the stay and the defendant intended the actions which constituted the violation." Fleet Mortgage Group, Inc. v. Kaneb, 196 F. 3d 265, 269 (1st Cir. 1999). See also Davis v. United States (In re Davis), 201 B.R. 835, 837 (Bankr. S.D. Ala. 1996) ("For a violation of the automatic stay to be willful, the only requirement is that 'the entity engage in a deliberate act to violate the stay with the knowledge that the debtor has filed for bankruptcy.'") (quoting In re Flynn, 185 B.R. 89 (S.D. Ga. 1995)); In re Bishop, 296 B.R. at 894 ("A stay violation is 'willful' if a creditor has knowledge of the bankruptcy filing and deliberately acts in such a way that violates the stay."). This court finds that the Defendant willfully violated the automatic stay. The Defendant knew that the automatic stay was in full effect unless the Debtors were in default under the terms of their mortgage for more than 20 days; the Defendant received notice from the Debtors' attorney that the Debtors were not in default under the terms of their mortgage and that therefore the automatic stay was still in existence; and the Defendant intended to initialize foreclosure proceedings against the Debtors' Residence. Therefore, Defendant had knowledge of the automatic stay and intended to commit the acts which violated the automatic stay. As such, the Defendant willfully violated the automatic stay. Because the Defendant willfully violated the automatic stay, the Debtors must be compensated for their actual damages, including costs and attorneys' fees, pursuant to the mandate in § 362(k)(1). Actual damages include out-of-pocket expenses, costs of the adversary proceeding, attorneys' fees, and emotional distress. The Debtors submitted no evidence of any out-of-pocket expenses. Although both Debtors testified that they missed work as a result of the Defendant's violation of the automatic stay, neither Debtor testified as to how many days of work were missed and neither Debtor testified as to the salary they received per day of work. Therefore, this court is not in a position to award the

7

Debtors' compensatory damages for out-of-pocket expenses.

The Debtors submitted no evidence of any costs associated with bringing this adversary proceeding. However, the parties stipulated that Debtors' attorney worked 13.0 hours on this adversary proceeding that has been pending for two years. The parties also stipulated that Debtors' attorney is entitled to compensation at the rate of $150.00 per hour. Therefore, this court awards the Debtors' $1,950.00 as compensatory damages for attorneys' fees. Because the Debtors have not yet paid this amount to their attorney, this court orders that Defendant pay this portion of the award directly to Debtors' attorney.

The Debtors submitted testimonial evidence of their emotional distress. "A bankruptcy court may award damages attributed to emotional distress if a preponderance of the evidence shows that emotional harm occurred and that the defendant's conduct in willfully violating the stay was the cause of that harm." In re Bishop, 296 B.R. at 895. The Debtors testified that they suffered embarrassment, humiliation, helplessness, and a pronounced fear of losing their home as a result of the Defendant's decision to initialize foreclosure proceedings against the Debtors' Residence. Although neither of the Debtors sought medical or psychological help as a result of these unpleasant feelings, the Debtors both testified that they missed work and suffered sleepless nights. Mr. Noland testified that his mother passed away during this period of time which exacerbated his feelings of helplessness. Mrs. Noland testified that she was very embarrassed when people would come by the Residence and take pictures and ask the neighbors if the Nolands still lived at the Residence. Mrs. Noland further testified that she was most upset by the reaction of her four children. Mrs. Noland also expressed that she agonized over what they would do if they really lost the Residence: their credit was shot and they had four children; she did not know if they could find a place to rent or how

8

they would be able to afford a place to rent.  In this case, the harm suffered by the Debtors is apparent by the Debtors' testimony: Once the Debtors learned that Defendant intended to foreclose on their Residence, the Debtors feared that they would lose their house and possibly become homeless with 4 children to take care of; this perfectly reasonable fear caused the Debtors anxiety and emotional distress.  It is readily apparent to this court that the fear of becoming homeless while being responsible for 4 children would cause emotional distress.  Because the Debtors have shown through their testimony that the initialization of the foreclosure procedure caused them emotional distress, the Debtors are entitled to recover compensatory damages for such emotional distress.  Id. See also In re Caffey, 384 B.R. at 309 ("To recover an award of emotional distress for a willful violation of the automatic stay, a debtor must suffer significant harm, establish that harm, and demonstrate a causal connection between the harm and the violation of the stay.").  Therefore, this court awards the Debtors $3,000 each as compensatory damages for emotional distress.

In addition to requiring that a debtor is compensated for actual damages when the automatic stay is violated, § 362(k)(1) also provides for the imposition of punitive damages in "appropriate circumstances."  11 U.S.C. § 362 (k)(1).   In general, "appropriate circumstances" exist when egregious or malicious conduct is present.  See, In re Bishop, 296 B.R. at 898.  These are some of the factors that courts look at in determining whether and in what amount punitive damages are warranted under § 362(k): "(1) the nature of the defendant's conduct, (2) the nature and extend [sic] of the harm to the plaintiff, (3) the defendant's ability to pay; (4) the motive of the defendant; and (5) any provocation by the debtor."  Swilling v. ACA Financial Services (In re Swilling), No. 08-1016-WRS, 2008 WL 4999090, at * 6 (Bankr. M.D. Ala. Nov. 20, 2008).

This court finds that the Defendant's conduct towards the Debtors was reprehensible in this

case. It is apparent from the facts in this case that Defendant has trouble keeping track of payments made in bankruptcy.[6] First, Defendant asserts that Debtors are 5 months behind in their mortgage payments when in fact they are current. Then, Defendant refuses to acknowledge that Debtors are current after receiving proof from the Debtors that they had made all payments during the time period in question. Defendant presented no explanation as to why it ignored the proof submitted to its attorney, proceeded to file with this court a Notice of Continuing Default on September 21, 2007, and commenced foreclosure proceedings against Debtors' Residence. Although the foreclosure was halted before the Debtors actually lost their home, this lucky fact is due to the diligence of the Debtors, not the Defendant. If the Debtors had not had enough foresight to keep copies of all the payments sent to the Defendant, the Debtors would have lost their home. The Defendant's inability to keep track of payments made by the Debtors is unacceptable, as is its complete disregard for the proof of payments sent by the Debtors' attorney.

This court finds that the extent of the harm to the Debtors is relatively minor. While the Debtors feared that they would lose their home, they were never actually forced to leave. In addition, while this court believes that the Debtors were genuinely embarrassed, humiliated, and emotionally distressed by the foreclosure proceedings, the Debtors also were allowed to live in their Residence for two years while this adversary proceeding was pending without making a single mortgage payment. There is no indication as to what the Debtors did with the money that they normally would have used to make their mortgage payment.

This court finds that the Defendant has the ability to pay a very large punitive award as

---

[6]Defendants offered no evidence, testimonial or otherwise, indicating that this case was isolated and that Defendant had safeguards in place to insure that what happened to the Debtors does not happen to other debtors in the future.

10

Defendant is one of the largest banks in the country. Although no evidence was submitted regarding the Defendant's financials, Defendant is a large institutional lender and has access to extremely large amounts of money.

This court finds that the motives of the Defendant was to collect the indebtedness owed to it by the Debtors. While this motive is not improper, the means used by the Defendant were. The actions of the Defendant indicate a lack of respect for the law and the rights of the debtors who borrow money from them.

This court finds that there was no provocation by the Debtors in this case because there is no evidence to indicate otherwise.

Based on the foregoing, this court finds that punitive damages in the amount of $1,000.00 are warranted. The award is so small because the harm to the Debtors was relatively minor and this court is not aware of any other cases in which the Defendant has been found to have engaged in this conduct. Let this be warning to the Defendant: Next time the award will be not so small.

## CONCLUSION

This court finds that the automatic stay is now and always has been in effect and that the Defendant violated the automatic stay by initializing foreclosure proceedings against the Debtors' Residence while the Debtors were current on their mortgage. As a result of this willful violation of the stay, the Debtor are entitled to receive $3,000.00 each as compensatory damages for emotional distress and $1,000.00 as punitive damages, for a total of $7,000.00. Defendant is ordered to pay this award directly to the Debtors. The Debtors are also entitled to reimbursement for attorney fees in the amount of $1,950.00. Because the Debtors have not yet paid their attorney, such fees are to

11

be paid directly to the Debtors' attorney.

An Order, consistent with these findings pursuant to Fed. R. Bankr. P. 7052, will be entered separately.

**DONE and ORDERED** this December 7, 2009.

/s/ C. Michael Stilson  
C. Michael Stilson  
United States Bankruptcy Judge